Mr. Dupree, when you're ready. Thank you, Judge Jones. Tom Dupree on behalf of BNSF Railway, and may it please the Court. Although this case involves modern rail inspection technologies governing legal rules, an old and familiar one, federal agencies must provide reasonable explanations for their actions. In this case, the Federal Railroad Administration did not give a reasonable explanation when it denied BNSF's request to implement its automated inspection program on new territories. What's unreasonable about an explanation that says we really need to wait so that we have a uniform application of the procedures, not only geographically, but among railroad companies? What's unreasonable about that? Well, Your Honor, what's unreasonable about that is, first, the order under review actually says that they don't want to short-circuit the RSAC process, RSAC, of course, being the Federal Advisory Committee that has been considering these issues for years. So, this notion of uniformity, uniformity is not a word that appears in the order under review. This is something that appeared for the first time in their appellate brief. The argument they gave was that they were concerned that granting our waiver would short-circuit the process. They've walked back the short-circuit argument on page 37 of their brief. They admit, wisely, but it's an important concession, that granting our waiver would not in any way hamper or impede the Advisory Committee from doing its work or the Federal Railroad Administration from ultimately developing a rule. But even if this Court were to entertain this uniformity concept, I think it's baseless. For one thing, this basis, the grounds for their uniformity argument, appears in a statute governing federal preemption, where Congress said that, to the extent practicable, there should be uniform rail regulation. But what Congress was speaking about was ensuring uniformity on the federal government vis-a-vis the states. Congress was not talking about national uniformity in the sense that they wanted a federal regulation as to which there could be no deviations or no waivers. The other thing I would say is that they're a new convert to this idea of uniformity, because, as the record shows, for years, the Federal Railroad Administration has been granting waivers from this very regulation. In fact, as the Court knows, they granted us. They granted BNSF a waiver. They've granted many other Class I freight railroads waivers. Something changed. They granted our waiver in 2021. At the time, the federal agency expressly found that BNSF's ATI, or Automated Program, was consistent with railroad safety and in the public interest. But then something changed. And in 2022, they now say, well, actually, BNSF's program is not consistent with railroad safety and is not in the public interest. No one is saying that federal agencies aren't permitted to change course. That it was not consistent with railroad safety. The grounds for denying our waiver was they said they do not find that our request was consistent with railroad safety and in the public interest. It was a rote, legal incantation of the statutory standard. It provided not a word of analysis, not a word of explanation as to why there was any safety concern. And as the court knows, the administrative record in this case powerfully demonstrates that these automated . . . Let me ask you this because I guess now I'm a little bit confused. How many statements of reasons for denying the waiver did you get? How many different communications did you get regarding the denial of the waiver? One. And that's the one where they said it's not consistent with safety? That's correct. That's correct. And then the second statement is the one you say appeared in the brief. Is that what you mean when you say there's a second reason? I'm sorry, the . . . The second statement of reasons for the denial appears in the brief. That's correct. So there's one that precedes the brief and then one in the brief. That's correct. I'm not talking about more than two. Well, their brief comes up with a bunch of different arguments, again, none of which we think are properly before this court. I think what's properly before this court, as the court knows under Chenery, this court can only uphold agency action based on the basis that the agency articulated when it issued the order. So any sort of post hoc, appellate, manufactured rationales are impermissible as a basis for affirming the agency. The only basis in the record that gave their reasons for denying the waiver, it's at pages 404 in the appendix, was simply this short-circuiting concept. That was the single only reason that the agency gave at the time for denying it. And they've walked it back. Well, look, the whole point of your argument is to say that, excuse me, that the extent of the waiver you were originally granted automatically would go to further territories subject to quote conditions. I'm looking at the waiver document January 19, 2021. Where is the language or what is the strongest language in that document that gives the railroad a right to extend its implementation of automatic inspection? The strongest language appears on page 351 where the agency said that this order sets forth conditions, specific conditions, and then I quote, which if met will allow BNSF to expand implementation of the relief. Well, just for the sake of argument, when you go back to the board's findings and decisions around 360FF, the board finds that unrestrained system-wide implementation is not appropriate at this point because given different weather, geographical, and operational challenges, considerations of those factors for individual territories must be conducted before implementing the relief prescribed in this waiver. You're right, Judge Jones. What they basically said was they're not going to approve systematic implementation as a first step. What they said was you can implement this program on two specified territories. We did it. Outer River and Southern Transcon. That's correct. We did it. And their condition was that if we successfully implemented it on those two territories, success being defined by hitting certain safety standards, which again, undisputed we did, undisputed that we did. They said if you hit those certain safety standards, FRA will allow you to expand the scope of the waiver, and that's why we're here today. But your argument is you get to expand it without regard for differences in regions, geographic differences, differences in weather, differences in age of the tracks and all of that. You just get to expand it. If you had a successful pilot over here, successful project in one place, you get to go to a different region and do the very same thing without regard for any of those externalities. That's your argument. Well, Judge, what we argued and we said was when we went back for the expanded waiver, we addressed that exact issue Your Honor specified. We said here were the conditions under the original waiver. Here are the conditions that would obtain in the new territories that we're looking to expand, and there are absolutely no significant differences that would require different treatment, different outcome. In other words, the test program, the initial waiver territories were actually chosen precisely because they've got a diversity of territory, weather conditions, grade, that sort of thing. That's why it was chosen. Nonetheless, when we went back and we asked for the expanded waiver, we said to the agency, look, these new territories to which we're seeking to expand, there is absolutely no relevant difference, to your point, between the first area and the area we're looking to expand. There's no subjectivity involved in the determination about whether or not there's some difference. There's no difference. Totally objective. There's no difference. We documented that in our submissions in the record. But the key point, Your Honor, is that in their denial decision, they never disputed that. They never disputed that. I think we would have a different case if in the agency's decision they had made Your Honor's point. They said, wait a minute. There might be some differences in the territories. It would be baseless, but at least if they articulated that, that would give a basis potentially for upholding it. But they never said that. We documented it. They never denied it. They never disputed it. They never pointed to evidence in the administrative record that would warrant different treatment. But again, under Chenery, that never was offered as a reason from the agency. At the end of the approval of the waiver, it says, FRA reserves the right to extend the waiver if circumstances warrant. And then it says, FRA reserves the right to modify or rescind this waiver upon receipt of information pertaining to the safety of railroad operations or in the event of noncompliance. But that plus the five or six conditions are the only limits on the nature of the first waiver. Right. And the language that Your Honor articulated, I think, really underscores, really in some sense, kind of the modesty of our request in that we are simply asking this court to direct FRA to allow us to operate this program in two new territories, but subject to FRA's retained authority to supervise, to ensure that we are meeting the safety targets. That's this Northern Transcon and Orange subdivisions, right? Correct. Go ahead. The terms of the waiver expressly provide that FRA retains the authority, they get data from us almost in real time showing the performance, and that if we don't meet the safety standards, which, by the way, are higher than the safety standards that would obtain under traditional historic visual inspections, but if we don't meet these heightened safety standards, FRA can modify the waiver, it can terminate the waiver, and it can take whatever actions it would deem appropriate. So we are not asking for saying, please bless this untested, unsupervised program in two new territories. We are simply saying we want to play by the same rules that FRA established with regard to those two original territories and run this program in the two new territories under their supervision and subject to all the conditions for safety that they have imposed. And if they do have concerns, if the safety numbers aren't what they are, they are free, as Judge Jones quoted, to revisit the waiver, to potentially terminate the waiver, or modify its scope to ensure safe operations. If we were to agree with your position, what would the result be? Well, the result would be vacating and remanding with instructions to FRA to grant the waiver. That's what the result would be. Well, in Chenery itself, what the Supreme Court did was vacate and remand for the administrative agency to reconsider the basis, to articulate properly the basis for its action. Right. And I think the reason why vacater with instructions to grant is the appropriate remedy here, Your Honor, is because the administrative record establishes definitively, indisputably, that we met the condition for expansion and that operating under this waiver in the two new territories will lead to a safer railroad. Undisputed. And again, FRA retains authority. If something goes wrong, if there's safety problems, to revisit the scope of the waiver or even revoke it. Well, one of their arguments is, for Pete's sake, you guys can maintain the same level of visual and do this as well. Well, that's their argument. Again, never appeared in the order under review. And it doesn't even make sense. Their argument to say that, well, you can just run these machines out there, I think misstates and misapprehends how one of these ATI, Automated Track Inspection Program, works. The genius or one of the key safety benefits to these programs is that they enable us to redeploy and redirect track inspectors to focus on problematic areas before a problem or track blossoms into a defect. I understand that, but they're just saying nobody's prohibiting you from doing this while still having the same number of inspectors go over every inch of the track. Well, that's their argument and it's meritless and it's misplaced because it would deprive us of the very safety benefits that this automated programs result in. For among other things, one of the benefits of these automated programs is they reduce the amount of time that inspectors spend on the tracks, walking the tracks. And so their argument to say, well, keep having the inspectors walking the tracks while you do the automated inspections, well, then we're not getting the safety benefit from reducing the time that people are on the tracks. Well, apparently the union doesn't agree with you on that. Oh, I know they don't. And I'm sure we'll hear from them. But again, their argument's not relevant to any issue in this case since it wasn't offered by the agency as a reason for the denial. And it also misapprehends how this would work in practice. In other words, if the automated system says there's a problem with mile 32, you need to go take a look at that. Well, under the union's approach, we can't take a look at that, at least not right away, because our inspectors have to continue their regulatorily mandated marches up and down miles 1 through 10. They have to do these daily rounds or weekly rounds on the tracks looking, and they can't redirect and refocus their inspection efforts on the areas that have been identified as problems that need to be fixed. I mean, that's okay. That's what the problem here is, is their argument, well, you can just roll out these machines. Well, it just deprives us of the safety benefits that these programs generate. That's the problem with their argument. And you mean the safety benefit of not having people walk the tracks? Correct. It's, Judge Graves, it really is, too. It's the benefit of not having people walk the tracks, at least in as great a volume as they do under the old regime. But number two, it's the point I was making in response to Judge Jones' question about enabling us to redirect our efforts and the inspector's efforts. And FRA has documented the safety benefit, that what the systems do is they say, instead of doing the mandatory march up and down the line, focus your efforts on the areas that have been identified by these systems where there could be a problem and you can fix it before it becomes a problem. It's a shift from a reactive model to a predictive model. That's what we're doing. And that's why it's delivered such remarkable safety results, again, that the federal agency doesn't dispute in this case. Well, aren't they working toward implementing the ATI technology nationally? What about? Aren't the FRA working towards that goal? I mean, they agree. Oh, we are looking to implement it, I mean, on a much broader scope. I mean, yes, ultimately, I think it could go nationally. Again, we're taking it one step at a time. They're just going too slow for you. So, well, I mean, it's more than going slow. They've just put a halt on this. How many other applications for waiver were denied? Well, I can think of at least one other that was outright denied. I know that there are multiple railroads that had ongoing test programs that the agency basically said they're going to come to a halt and not be re-upped in November, which they've done. So for years, I mean, going back to, this is not new, FRA has described it as the agency's decision to implement these programs because we all agree with the benefits of the technology. And you go back, I mean, this is not a new thing. The Obama administration, the Trump administration, all were bullish on this. They encouraged us to develop it. They supported it. They developed it themselves. And then everything came to a screeching halt. All right. Well, you have time for rebuttal. Ms. Farmore? Ms. Farmore? Good morning. May it please the Court? I'm Cynthia Farmore, here for the federal government. In the decision on review, the Federal Railroad Administration decided to prioritize its comprehensive and deliberative process to update its national safety rules for track inspections. Do you agree with Mr. Dupree that the agency, at some point, has walked back its short circuit explanation? No, Your Honor. Absolutely not. So when the agency said that it did not want to short circuit the RSAC process, what it meant by that was it did not want to bypass the RSAC process. That's the ordinary meaning of short circuit. If you look at Merriam-Webster, that's the first definition. The argument offered by the railroad is the second definition, to frustrate or impede. But really, it's quite clear that granting this additional waiver would bypass the RSAC process. How long has the RSAC been in effect? The RSAC, I believe, in 2019. So it had already been underway for two years when this waiver was granted. So the RSAC process has been underway for a while, but it has been waiting for different railroads to collect necessary data to support that process. And so when the first waiver was granted, the other railroads were more than two years away from collecting the relevant data. When FRA denied this particular waiver, the end was in sight. At this point, the four reigning railroads have finished their test programs. That data will be submitted to RSAC to consider in January. RSAC is making real progress here on this front. And what the agency decided here was that it was important to let that process continue to make sure that they were able to— The problem with that, that runs foursquare into the Chenery decision, which is one of the hallmarks of due process in administrative lawmaking. And Justice Frankfurter said that we can't substitute for the administrative agency by allowing the litigators to change the basis of the administrative agency's decision. Your Honor, to say that safety and uniformity are new bases for the agency's decision is to ignore what the RSAC process is and what it is designed to do. The agency very clearly identified the RSAC process in the decision on review, and the very point of that process is to deliberately— They did not. I mean, when the waiver was granted, I don't see a word in the January 19, 2021 thing about RSAC. Your Honor, the decision on review is the one from 2022, and there, the agency's decision very explicitly— There's one paragraph, one paragraph that says the ongoing RSAC task, yes. And so that is the basis of your argument today. That paragraph, along with the surrounding context, absolutely, Your Honor. Well, the surrounding context is nothing, because what your opinion talks about is it describes—one paragraph describes the existing waiver. One lengthy paragraph describes BNSF's position. The next paragraph says we published a notice, and the Brotherhood of Maintenance employees objected as they objected to granting the original waiver, and then you have about four sentences that say, oh, well, now it's the RSA task force. But you don't talk about safety. So, Your Honor, I would point this Court to this Court's decision in Handley v. Chapman, which I think is quite instructive on this point. What? This Court's decision in Handley v. Chapman at 587 F. 3rd 273, that's an example where this Court found safety to be the basis for an agency's decision, even though the word safety didn't appear in the agency's decision on review, and that was based on the surrounding context. And just two terms ago, unanimously, the Supreme Court in Garland v. Ming Dai reemphasized that magic words are not required. But here, looking at this part of the agency's decision in this paragraph, the agency focused on the RSAC process. It said that it wanted to identify the optimal approach to track inspection, to look at the multiple railroads test program. Well, let me just ask you a question. Is it factually correct that the agency says, well, let them eat cake, let them run the ATI and run the visual inspections as they're currently undertaken? Is that correct, that you are essentially telling them to switch back from a predictive system that ATI facilitates to a reactive system because the visual inspectors still have to patrol the tracks according to some schedule? No, Your Honor. FRA has not rescinded the waiver that the railroad has. So for those two sections only. But you're saying they can't expand it. What about in the expansion territories? Well, at this time, and again, repeatedly in the decision I'm reviewing. So you're not answering my question. Maybe you misunderstood it. In the expansion territories, FRA says it's okay for you to run your ATIs, but that doesn't mean anything because the inspectors will still have to be visually doing every inch of the track and you can't remediate unless they approve of it. Is that right? So at this time. Is that right? If I understand your question, I think it's right that at this time, the agency is not allowing the railroad to reduce the current level of visual inspections that is required by the current regulations. So basically, you're letting the buggy whip control access to the four-wheeled vehicle. You're letting visual inspection of a hand that's like this, as opposed to approving the new technology of x-rays. I mean, isn't that totally inconsistent with the full-throated approval of the benefits of ATI as a predictive way to enhance railroad safety? No, Your Honor. Really, this case comes down to a process question. Whether FRA . . . But that's what agencies always say. Give us more time. And yet, this is an instance where the agency cannot contradict and, in fact, has approved of the enormous enhanced safety benefits by orders of 101 or whatever it is in the predictions. I would like to highlight that FRA is not out on a limb here. The Association of State Railroad Safety Managers, which represents 31 states, including two in the circuit tax . . . Well, I'm sorry, but that has nothing to do with the basis on which the FRA denied approval here. Well, looking at the context of the first waiver decision, the FRA did rely on the Association of State Railroad Safety Managers, and they're urging that FRA move carefully in this area because the reason these issues . . . Where was that in your first waiver decision? So, in the first waiver decision . . . I mean, I . . . Well, you can . . . I mean, I don't want to waste . . . We cite it in our brief. Okay. So, but if you look at what the Association said is that the reason this is so complicated is that we're talking about one type of technology, track geometry cars, and it's undisputed that they do not detect every type of problem that could affect railroad safety, and so they urged FRA to move carefully and to deny . . . Undisputed that what doesn't detect every . . . Track geometry cars. Well, I'm sorry, but here in January of 21, you said, first, with regard to track geometry, it is well established that TGMS and ATGMS identified geometry defects more precisely and accurately than visual inspections. The number of geometry defects that identified decreased, suggesting that overall the track geometry of the test program territory improved over time, and you've got a chart demonstrating that, and the severity of the defects the system identified throughout the test program demonstrates an overall improvement in the track geometry of the test program territory as that program progressed. And I could go on, because it is a full-throated endorsement of this technology. Your Honor, absolutely FRA found that under the metrics of the test program, the railroad successfully implemented this technology, and it did have safety improvements on the test program . . . But just give us more time, and, you know, how many . . . Your Honor . . . I mean, you know, how many track derailments are you going to risk while you're taking more time? Well, once again, I would highlight . . . For political reasons, I might add, because I believe your brief also nakedly implies that this was political reasons, which I take to be protection of the Union. Your Honor, I don't believe that this is a partisan decision, and again, I would point this court . . . Well, your brief said it's okay to justify something on a political basis. Well, we're not talking about . . . Did you say that? Your Honor, I don't believe we said this was a political decision . . . I think it did. I mean, really, the administration has not walked back from ATI. It recognizes that ATI could improve safety, and it is exploring ATI in the RSEC process for that very reason. But again, the Association of State Railroad Safety Managers, which includes Texas and this area in the first waiver decision, and it emphasized that the rate . . . Well, again, that is not the basis of the second decision. But it supports the consistent position of Apparatum . . . I don't think we can make up arguments for the agency consistent with Shenry. I don't think the litigators can make up arguments, because the whole point of the administrative decision process is that you have the administrators expounding what is the . . . And as you know, the history of Shenry was that the case was remanded to the SEC. They explained their decision on a different, more full-throated basis. It ultimately went back to the Supreme Court, which approved it. Your Honor, absolutely, we are only defending the decision on review . . . You're trying to short-circuit us, as opposed to the railroad trying to short-circuit the RSAC. In the decision on review, the agency really emphasized only the importance of letting the RSEC process continue to identify the optimal approach to track inspection. And that is the basis on which we are defending the agency's decision here. I don't think anything in the Railroad Safety Act compels the agency to address this very rather than through a more deliberative, holistic approach in the RSAC. The railroad here today is a member of the RSAC. Well, it is called the Railroad Safety Act. Your Honor, absolutely. And these issues about ATI present very real safety issues. The safety record under the first year of the waiver is not pristine. There have been five track derailments, 81 multi-class drops, which pose a significant risk of track derailments during the first year of the waiver. And it is necessary to holistically and carefully evaluate all of this data using not only this one railroad's experience, but all railroads that have been exploring these technologies. And I would like to just touch briefly on the question of remand with my remaining time. If this Court disagrees with the agency and decides that the Railroad Safety Act really does compel the agency to evaluate these decisions on an ad hoc basis rather than more deliberately through rulemaking, the proper approach here would be remand. These are technical issues of railroad safety. The agency, because it deferred to the RSAC process, has not comprehensively on the record looked at the railroad's safety record here in the first year of the waiver and would need to do so before extending it. Do we have more time? I would be happy to answer any other questions this Court has. Thank you. Thank you. Mr. Edelman. Good morning, Your Honors. I'm Richard Edelman. I am counsel for the Brotherhood of Maintenance Way Employees Division, IBT, the union that represents BNSF maintenance of way workers, including their track inspectors who perform the regularly required FRA mandated visual track inspections, not only for track geometry but for other defects that the machines don't pick up. And as representative of the track inspectors, I want to emphasize that the requested waiver was to reduce the frequency of human track inspections. It was not about allowing greater use of track inspection machines. And to your question, Judge Jones, nothing is stopping BNSF from running the ATI machines as often as they want, wherever they want. Well, the point is, I think, that they've invested millions of dollars in this technology, and as is the case with transferring from the buggy whips to the four-wheeled, the combustion engine, you can work smarter and deploy inspectors more strategically if they are combined with the use of the ATI. And nothing is stopping them from doing that? But they will accept that you just have the same number of inspectors out walking the same mileage of the tracks, right? No, they can deploy those inspectors for the targeted inspections wherever they want. If they don't have enough inspectors to do both, it's because they have dramatically reduced the maintenance-of-way workforce over recent years. But they can have a track inspector workforce that both does the traditional visual track inspections and also does the targeted inspections that they want to do under this program. Nothing is stopping them from using the machines as much as they want. Nothing is stopping them from having track inspectors go to the target places where the machines note there's potentially a problem. Well, then why did you object to the waiver in the first place? We object to the waiver because it's reducing the frequency of the human track inspections, which is the work that our people do. That's why we object to it. So basically you're saying that because they are denied a waiver on these additional, then even if they use the ATI, which costs millions of dollars, your people work to rule and they will still be walking every mile. First of all, it's not a work to rule, which is a job action. And second, in terms of the regulation, our people will continue to do the visual inspections which pick up problems on the right of way. Other visual conditions that the machines don't catch, they're track geometry machines. So ultimately this is nothing more than feather bedding, right? It's absolutely not, Your Honor. This is the jobs our people do. This is not feather bedding came in the context of moving from steam locomotives to diesel locomotives for the job of a locomotive fireman where there was no longer anything to feed into a steam engine, where there was no work for them to do. Also, I want to point out the union does not oppose the use of the automated track inspection machines. We agree with those machines. We want our track inspectors to see that data. The question is about removing the visual track inspections, and our people are professional, trained, experienced people, and they think as a matter of safety that they should still be doing those visual track inspections in addition to the use of the machines. Well, I mean, that would be one thing, and that's a real interesting policy argument that perhaps the FRA could have made in denying the waiver, but they didn't. And we are confined to the justification that the agency used, which is one brief paragraph in said RSAC. And we think it is not unreasonable for them to do that, but let me point out that they're appealing. They have two arguments about why this is unsafe. One, it takes track inspectors off the tracks so they're not exposed to harm being on the tracks. Now, there's three responses to that. One, track inspectors shouldn't be at risk when they're on the tracks because they're supposed to be protected by the carrier. Two, there's no data that actually shows a reduction in the record that shows a reduction in injuries as a result of this test program. The NSF makes the assumption that because they're spent less time on the tracks, there will be fewer injuries. There is no record evidence to support that. The NSF says, yeah, we put in evidence. We showed that there was less time spent on the tracks by track inspectors, but that's tautological. We reduced the amount of time they're on the tracks, so there's less time on the track. But there is no evidence of actual reduction in injuries, and that leads to the third point, which is, are people track workers? They're on the tracks, and it is dangerous work, but that's the work that they do, and the union is a strong advocate for their safety, but their jobs involve inspecting the track, and if what they say is true, they're still going to be on the tracks exposed to exactly the same risk, just somewhere else. So their argument that this has to be done in order to protect the safety of the rail workers makes no sense because one way or another, they're going to be on the tracks. And as for the general safety argument, that what we're really doing here is the targeted inspections. Again, they can do targeted inspections all they want, but it requires them to have the workforce to do it, which they have arbitrarily reduced. And so neither of their safety arguments holds up at all. Well, but again, I mean, unfortunately for you, the FRA didn't say anything about safety except for this RSAC process. They could have adopted your argument, could they not? But they didn't. They could, Your Honor, and I see that my time is up. I'll just say they're the petitioner. Their argument depends on proving that the agency's decision is inconsistent with its safety mandate. They haven't proved that case. Okay. Thank you. Thank you. Mr. Dupree. Just a few quick points on rebuttal, Your Honor. First, Your Honor asked some questions about the RSAC timing. The FRA is correct that this process began in 2019, and candidly, there's no end in sight. The RSAC is not even having another meeting until sometime next year. And to Judge Jones's point, when the FRA granted us the initial waiver, the RSAC study was ongoing at that time. It didn't seem to pose a problem to granting the initial waiver. It didn't pose a danger of short-circuiting the process. They granted it. And so at a near minimum, there's a dramatic change in agency position that is unacknowledged and unexplained. And the RSAC proceeding didn't pose a problem to the first waiver, but it poses a dispositive problem to the second waiver. The second point I wanted to address is with regard to remedy. I think the reason why a remand with directions to grant the expanded waiver is warranted and appropriate in this case is that if this court were simply to issue a bare order saying vacate and remand with no time limits on when the agency needs to act, no guardrails to constrain or guide the agency on remand, it doesn't take Sherlock Holmes to figure out what's going to happen. They've said publicly, well, they want to wait on this until the RSAC finishes its process in, I don't know, 2027 or whenever that might be. So what if we were to set some sort of a timeline with specificity? I think that would be very helpful, Your Honor, because otherwise, again, we're going to be in 2027 without a decision on this. But beyond that, I think it would be important for this court to acknowledge the undisputed fact in the record that number one, we satisfy the FRA's conditions, and number two, there is no dispute. I mean, that's why this whole case has a bit of an Alice in Wonderland quality about it because the government and BNSF are all on common ground that these programs increase safety. Everyone involved in this case, maybe not my colleague Mr. Edelman, but everyone else involved acknowledges that these programs increase safety. This is a federal agency that is tasked in its organic statute with making safety its highest priority. Even the waiver statute under which it acted in this case says it must consider whether the requested waiver is consistent with railroad safety. And not only does their decision not even mention safety, doesn't even engage this critical question, but the administrative record powerfully demonstrates and admits of only one conclusion, that allowing us to operate in these two territories under an expanded waiver will lead to safer operations. So that's why we think directing the agency to grant the waiver is appropriate, but at a bare minimum, Judge Smith, yes, we do think there needs to be a time limit placed on the agency's decision-making process, but also that the court installs some sort of guideposts or guidelines as to how the agency thinks about this on remand. Do you have any authority for your original request was to vacate on remand with instructions to grant the waiver? Would that be consistent with what? Finding that it was arbitrary and capricious to deny, or what? I think this court would be exercising its authority under the APA. I believe it's Section 706, Paragraph A, which allows and authorizes and empowers this court to order agency action unlawfully denied. So that's the statutory basis for this court issuing such an order. I think if we were to look to this court's precedent, we cited in our briefs the Hall case, which is a situation where this court had a situation involving FERC, the energy agency, where it directed the agency to grant a waiver on remand. So I think there's ample authority for doing it. I admit that this court has discretion as far as a remedy goes, whether to issue a bare vacate or order or whether to remand with instructions to grant. For the reasons I've mentioned, we think the latter is the appropriate course here. Okay. All right. Thank you, Your Honor. All right. Thank you.